FILED
2026 Sep-01 PM 01:12
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ALABAMA,
SOUTHERN DIVISION

| | |
|---|---|
| **Jeffrey Salmon,**<br>**Lindley Salmon, and**<br>**Birmingham Roofing & Sheet Metal, Inc.,**<br>*Plaintiffs,*<br><br>v.<br><br>**Capital Preservation Services, LLC,**<br>**Summit Accounting Services, LLC,**<br>**Dallas Anthony & Jeffords, PLLC,**<br>**Hunter Thomas,**<br>**Cogent Analytics, Inc.,**<br>**Merlin VanGerpen,**<br>**Monica Lester,**<br>**Thomas Walton Dallas, and**<br>**Jason Todd Mardis,**<br>*Defendants.* | **JURY DEMAND** |

# COMPLAINT

Plaintiffs Jeffrey Salmon, Lindley Salmon, and Birmingham Roofing & Sheet Metal, Inc., hereby file this Complaint against Defendants Capital Preservation Services, LLC, Summit Accounting Services, LLC, Dallas Anthony & Jeffords, PLLC, Cogent Analytics, Inc., Thomas Walt Dallas, and Jason Todd Mardis for the unlawful actions and damages caused to Plaintiffs as a result of their

combined involvement in a fraudulent tax scheme. Plaintiffs respectfully allege as follows:

## I. Jurisdiction

1. This Court has diversity jurisdiction over this matter pursuant to 28 U.S.C. § 1332 as the Plaintiffs reside in Alabama, the Defendants reside outside of Alabama, and the amount in controversy exceeds $75,000.

2. This Court also has supplemental jurisdiction under 28 U.S.C. § 1367, as the claims are so related that they form part of the same case or controversy.

3. Venue is proper in the Northern District of Alabama under 28 U.S.C. § 1391, as the Defendants have availed themselves of the jurisdiction by advertising, soliciting, and providing services within Jefferson County, Alabama, where Plaintiffs reside. The Tax Plan, as described below, was then provided to the Plaintiffs within the Northern District of Alabama. Accordingly, the damages resulting from Defendants' bad acts were incurred within this venue.

## II. Parties

4. Plaintiff Jeffrey Salmon ("Jeff") is an adult resident of Jefferson County, Alabama, and retained the services of Defendants to receive legitimate tax and business advice.

5. Plaintiff Lindley Salmon ("Lindley," and, together with Jeff, the "Salmons") is an adult resident of Jefferson County, Alabama, and retained the services of Defendants to receive legitimate tax and business advice.

6. Plaintiff Birmingham Roofing & Sheet Metal, Inc. ("BRSM," and together with the Salmons, the "Plaintiffs") is a corporation formed under the laws of the State of Alabama, headquartered in Jefferson County, Alabama, and retained the services of Defendants to receive legitimate tax and business advice.

7. Defendant Capital Preservation Services, LLC ("CPS") is a Wyoming limited liability company with its principal place of business in Flowood, Mississippi. CPS provided tax strategies, asset protection planning, and estate planning. Dallas and Mardis formed the company that became CPS on September 3, 2014, originally calling it Advanced Tax Planning, LLC. They changed its name to CPS in September 2015. Initially, Dallas' wife (Angela Dallas) owned 50% of CPS through an entity called Strategy Marketing, Inc., and members of the Mardis

family (including Mardis' wife, Kimberly Mardis) owned 50% of CPS through an entity called KDOM, Inc. In 2018, a CPS employee acquired a 5% ownership interest in CPS. Since 2020, that employee has owned 5% of CPS and Todd Mardis and Kim Mardis own 95% of CPS through KDOM, Inc. CPS is subject to this Court's jurisdiction. No Member of CPS is a resident of Alabama.

8. Defendant Summit Accounting Services, LLC ("Summit"), a limited liability company formed under the laws of the State of Mississippi, provided accounting services directly to CPS and indirectly to Plaintiffs, advising on matters that enabled the tax scheme to appear legitimate. No Member of Summit is a resident of Alabama.

9. Defendant Dallas Anthony & Jeffords, PLLC ("DAJ Tax Law"), is a law firm providing legal services, including document drafting and tax-related advice, to CPS and Plaintiffs. No Member of DAJ Tax Law is a resident of Alabama.

10. Hunter Thomas ("Thomas") is an attorney that worked with DAJ Tax Law during the applicable period that provided bad legal and tax advice to the Plaintiffs. He resides in Mississippi.

11. Defendant Thomas Walton Dallas ("Dallas") is a licensed attorney who resides in or near Jackson, Mississippi. I2005, he established his own law firm

called T. Walton Dallas. P.A., focusing on income tax planning and estate planning. He is subject to this Court's jurisdiction. Dallas is believed to have founded, worked for, or substantially assisted CPS and DAJ Tax Law in this scheme.

12. Defendant Jason Todd Mardis ("Mardis") resides in Flowood, Mississippi. He obtained a license to sell insurance and began doing so in 1993. He is, or was until recently, the president of Capital Preservation Services, LLC. He is currently in the custody of the Mississippi Department of Corrections. He is subject to this Court's jurisdiction.

13. Defendant Cogent Analytics, Inc. ("Cogent," and, together with CPS, Summit, DAJ Tax Law, Dallas, and Mardis, the "Defendants"), a corporation formed under the laws of the State of North Carolina with its primary place of business in Greensboro, North Carolina, is a consulting firm that recommended CPS to Plaintiffs without performing adequate due diligence on CPS's practices.

14. Defendant Merlin VanGerpen ("VanGerpen") was at the time applicable to this Complaint a Senior Business Analyst with Cogent. He is a resident of North Carolina.

15. Defendant Monica Lester ("Lester") was at the time applicable to this Complaint a Strategic Partnership Manager with Cogent. She is a resident of North Carolina.

## III. Relevant Facts

16. The Defendants in this case conspired to concoct a fraudulent "Tax Plan" that they marketed to small business owners, such as the Salmons.

17. The Tax Plan was, in reality, a bogus system that CPS had developed, in conjunction with Dallas and Mardis, used to hide and shield income from tax.

18. Summit and DAJ Tax Law facilitated the bogus Tax Plan conspiracy by alleging to provide genuine professional advice to unwitting business owners, providing a veneer of legitimacy to what was, in reality, a pre-packaged tax fraud scheme.

19. Plaintiffs were sucked into this scheme initially through Cogent, a business consultancy that Plaintiffs had hired.

20. Together, the Defendants pitched the Tax Plan to the Plaintiffs, who then paid tens of thousands of dollars under the mistaken belief and in reliance on

CPS's allegations that the Tax Plan would save them far more in taxes than the cost of the Tax Plan itself.

21. As a result of the fraudulent representations of CPS, Dallas, and Mardis, as well as the incompetence of Summit and DAJ Tax Law, Plaintiffs have suffered a yet unknown amount of damage, as they will almost certainly owe significantly more in taxes, as well as the penalties, interest, and fees necessary to remediate the immense amount of damage that Defendants have caused.

### A. Overview Of the Tax Scheme

22. Beginning in approximately 2014, Dallas and Mardis began organizing and promoting a number of tax savings strategies to customers primarily located in Mississippi, Alabama, Texas, Wisconsin, and Florida. These tax savings strategies are often combined into a booklet called the "Tax Plan."

23. Since 2014, approximately 600 to 700 customers have purchased the Tax Plan.

24. Customers generally pay a flat fee (that averages between $25,000 and $35,000 in the first year) to purchase the Tax Plan.

25. Customers generally pay an additional amount to purchase the "Audit Defense Plan" that Defendants offer.

26. Defendants emphasize the tax savings their customers can expect from purchasing the Tax Plan. For example, they have claimed that the Tax Plan has saved customers an average of $40,000 to $60,000 in taxes per year, reduced customers' tax rates from 34-37% to 17-25%, and reduced customers' tax liabilities by 30% to 50%.

27. Defendants primarily market the Tax Plan to small business owners, including medical professionals, attorneys, consultants, and general contractors.

28. Defendants primarily market the Tax Plan to customers that have between $400,000 and $2 million of taxable income.

29. The basic steps of the Tax Plan are:

a. First, Defendants tell the customer to create a new corporate entity to supposedly provide marketing services for the customer's existing business. Defendants form that entity as a C-corporation and refer to it as the "marketing company." Defendants tell the customer to own only 4% of the marketing company, and to find two other individuals

who are unrelated to the customer to own the remaining 96% (usually 48% each). However, the customer generally retains full control over the newly-created marketing company.

b. Second, Defendants tell the customer to fund the marketing company with money from his or her business in an amount generally equal to 10% of the business's gross income. Defendants tell the customer to label that amount as a "marketing fee" and have the customer's primary business claim a tax deduction for that amount.

c. Third, Defendants tell the customer to spend a minuscule amount of that "marketing fee" on actual marketing activity, while funneling the rest back to the customer personally (and, often, to his or her family members including minor children) via payments made towards "employee benefits." Those benefits include medical expense reimbursements, meals, tuition, vehicle expenses, and retirement savings.

d. Fourth, Defendants state that the customer's marketing company can claim tax deductions for providing those purported "employee

benefits" to the customer and his or her family (including minor children).

e. Fifth, Defendants state the customer can claim a tax deduction for renting the customer's personal dwelling(s) to his business at exorbitant rates, generally stating that the customer can deduct between $2,000 and $4,500 per day.

30. The abusive nature of the Tax Plan largely relates to Defendants' statements that customers can claim large tax deductions under the guise of a "marketing fee" paid to their newly-created marketing companies, yet spend very little of that amount on actual marketing expenses. Instead, Defendants state that customers can spend that "marketing fee" on benefits for themselves and their family members as

shown in the picture below from a CPS marketing presentation from 2017:




31. Defendants also furnish charts to their customers that identify the portion of the so-called "marketing fee" that should be spent on actual marketing expenses. For example, Defendants stated that one customer should transfer $125,000 to his marketing company in 2015 (first row below), yet stated that customer should only spend $5,000 of that amount (4%) on actual marketing activity (second row below)

and the rest on personal benefits:

| Marketing, Inc. Estimate for FYE 11.30.2015 | | $125,000 |
|---|---|---|
| Marketing Expenses | $5,000 | |
| NQDC | $75,000 | |
| Meal Reimbursement Plan | $7,500 | |
| Meals Convenience | $11,200 | |
| Vehicle Depreciation Estimated | $2,000 | |
| Medical Reimbursement Plan | $10,000 | |
| Using a Company Fiscal Year End | | |
| Estimated Taxes | $13,750 | |
| Dividends | 100 | |
| Total Expenses | $124,550 | $124,550 |
| Cash Remaining | | $450 |

32. Defendants describe this marketing scheme as "us[ing] corporate structuring to make typically non-deductible items deductible while receiving tax free reimbursements":



CAPITAL PRESERVATION SERVICES
ADVANCED TAX PLANNING & BUSINESS DEVELOPMENT

- **CLIENT PROFILE:**
  - Self-employed or can control the way they are paid
  - Paid at least $50,000 in combined Federal and State income taxes; revenue of at least $750,000 to $1,000,000
  - Does not plan on retiring within the next 5 years
- We use corporate structuring to make typically non-deductible items deductible while receiving tax free reimbursements

33. Defendants' scheme attempts to avoid the marketing companies being treated as being within the same controlled group as the operating companies by calling for their customers, i.e. the owners of the operating companies, to only technically own 4% of the marketing companies, with the other 96% being owned by two outside shareholders. The customers' formal lack of control over the marketing companies, however, is insufficient to avoid the effect of the controlled group rules, which provide that the relevant test is actual control, rather than formal voting control.

34. In essence, Defendants' Tax Plan is a bogus tax strategy that states customers can create a bogus company to facilitate unlawful tax deductions for personal expenses.

35. The tax deductions Defendants state that customers can claim as described above are unlawful for one or more of the following reasons:

36. The "marketing fee" is not intended to be used for actual marketing activity, but is intended to pay the customer's personal expenses. The marketing company lacks a profit motive and is a sham entity.

37. The "marketing fee" is not an ordinary or necessary business expense.

38. The deductions claimed by the marketing company for amounts paid as employee benefits are not allowable because the benefit plans violate rules prohibiting discrimination in favor of highly-compensated employees or the customers' family members were not bona fide employees.

39. Because the marketing company was under the customer's de facto control, its employees and the employees of the customer's existing business are deemed to be part of the same controlled group of corporations for the purpose of applying rules prohibiting discrimination in providing benefits. Accordingly, the benefits

generally needed to be offered to all the customer's employees, not just the customer and his or her family members who were nominally employees of the marketing company, to be deductible.

40. Amounts paid for personal, family, and living expenses are not deductible.

41. Amounts the marketing company spends on employee benefits and deferred compensation are generally spent for the personal benefit of family members and are not reasonable compensation.

42. Amounts that the customer's business deducted for renting the customers' dwelling are grossly overstated.

43. Amounts set forth as marketing expenses and compensation for services rendered to the marketing companies are grossly overstated.

44. The arrangement set forth in the Tax Plan lacks economic substance.

45. The Tax Plan carried the explicit recommendation of each of the subject Defendants and was passed off primarily by Defendants CPS and DAJ Tax Law and implicitly by the remaining Defendants as actionable legal, accounting, and tax advice.

46. However, this legal, accounting, and tax advice was not just misinformed, but was blatantly illegal.

47. In a recent case, the United States Tax Court held that several of CPS's customers that had been audited by the IRS were not entitled to a total of $969,144 in deductions they had claimed for bogus marketing expenses. *Sinopoli v. Comm'r*, T.C. Memo. 2023-105, 2023 WL 5202419 (T.C. 2023). The Tax Court specifically stated that it did not find the customers' purported business justification for starting the marketing companies to be credible. *Id*. at *5.

48. The Tax Court also stated that the customers had "adopted a tax savings scheme to distribute [their business's] earnings to [themselves] through purported rent payments." *Id.*

49. In another recent case, the United States Tax Court held that the creation of a marketing company for a CPS customer "was one of the tax reduction strategies CPS had recommended in the Plan" and disallowed significant amounts of purported marketing expense deductions. *See Jadhav v. Comm'r,* T.C. Memo. 2023-140, 2023 WL 8081787, at *11 (T.C. 2023). The Tax Court also held that rental payments that customer deducted "were unreasonable and something other

than rent" and that "rental arrangement . . . was another tax reduction strategy CPS had suggested in the Plan." *Id*. at *12.

### B. Defendants Organized the Tax Plan

50. Dallas and Mardis organize and sell the Tax Plan through CPS.

51. Dallas and Mardis act on behalf of CPS when organizing and selling the Tax Plan.

52. Dallas and Mardis use email addresses associated with CPS to organize and sell the Tax Plan.

53. Mardis has served as President of CPS.

54. In addition, Dallas has used his law firm, T. Walton Dallas. P.A., to organize and sell the Tax Plan.

55. Defendants require that customers sign an engagement agreement to purchase the Tax Plan.

56. In at least one engagement agreement, CPS promised to find a certain amount of tax deductions for the customer, calling it a "Tax Benefit Guarantee."

57. Defendants request information from potential customers (including via a "Confidential Client Questionnaire for Income Tax Planning") regarding the customers' expenses, including expenses related to vehicles, insurance, "personal living expenses", and retirement contributions.

58. Defendants use that information to analyze the customer's income, payroll, and tax situation.

59. Defendants project the tax savings that customers could expect from purchasing the Tax Plan.

60. CPS schedules, and Dallas typically conducts, initial calls and meetings with potential customers.

61. Dallas, on behalf of CPS, generally writes the Tax Plan for customers.

62. Dallas writes boilerplate legal opinion letters that are attached to the Tax Plan. The opinion letters generally state that "in the event that the Taxpayer is challenged by the IRS, it is more likely than not that the taxpayer will be entitled to the [deductions discussed above]."

63. Although the Tax Plans do contain some differences (e.g., the projected amount of tax savings), they generally contain the same boilerplate language regarding the availability of tax deductions to the customer.

64. CPS creates boilerplate agreements and template documents that are used to implement the Tax Plan and furnish those documents to customers.

65. Those documents include template dwelling unit rental agreements and rental invoices, marketing agreements and invoices, disability plans, medical plans, meal plans, mileage reimbursement plans, tuition assistance plans, cell phone plans, and deferred compensation plans.

66. CPS prepares and furnishes corporate formation documents for the marketing companies that are part of the Tax Plan. Those documents include articles of incorporation, corporate minutes, corporate bylaws, and stock agreements.

67. CPS is not a law firm.

68. CPS furnishes forms to the IRS, such as elections to be taxed as an S-corporation and requests for employment identification numbers, about those newly-created marketing companies.

69. Defendants help customers obtain signatures from the individuals that, on paper, have an ownership interest in the customers' newly-created marketing companies.

70. Mardis became a 48% shareholder for at least one of his customers' marketing companies.

71. Defendants tell customers how much money to allocate to their newly-created marketing companies, stating customers should only use a small portion of that amount for actual marketing activity.

72. Dallas helps customers "prefund" their marketing companies to generate additional tax deductions.

73. Defendants state their customers should make payments to the marketing company to give it the appearance of it having engaged in economic activity.

74. Defendants prepare notes, organizational charts, and cash flow statements regarding the marketing companies that they create for customers that purchase the Tax Plan.

75. Defendants help customers implement the Tax Plan, including hosting regular phone calls and meetings, providing weekly worksheets, and hosting an online portal to save business receipts.

76. Defendants tell customers how much to charge for renting their personal dwellings to their businesses and provide comparables.

77. For example, Defendants instructed one customer to charge "$3,000 per day for your primary residence." Defendants told another customer to charge $4,000 per day for renting his personal residence to his business. Dallas instructed one customer to rent his dwelling to his business for $2,500 per day.

78. Defendants sometimes arrange for appraisers to provide opinions regarding the purported rental values of their customers' personal dwellings.

79. Defendants administer the retirement plan that is part of the Tax Plan, file documents regarding the retirement plan, consult with customers regarding the retirement plan, prepare and submit records, and help customers make withdrawals from the retirement plan.

80. Defendants help customers manage the documents they need to implement the Tax Plan.

81. Defendants meet twice per year with their customers regarding the Tax Plan.

82. After the first year, Defendants meet with customers to "back test the tax savings" which means determining whether the predicted savings were realized from the Tax Plan.

## C. Defendants Promoted and Sold the Tax Plan

83. Defendants promote and market the Tax Plan through various channels, including presentations, meetings, seminars, webinars, podcasts, promotional videos, and retreats.

84. Defendants pitch the Tax Plan as a "tax strategy" or a "tax savings plan," even referring to it as "a turn-key income tax plan."

85. With respect to the Tax Plan, Mardis stated that his best advice is to "go for it because of the tax savings."

86. Defendants claim to have saved customers a total of $130 million in taxes.

87. In a book that Mardis and Dallas wrote in 2021 called Capital Crusaders, Mardis claimed that if he encountered an optometrist paying $200,000 in federal taxes in one year, he could "get it down to $125,000 with ease."

88. To generate business, CPS claimed that customers can either pay a fee to purchase the Tax Plan or pay their taxes:




89. Mardis stated that CPS is dedicated "100 percent to tax reduction strategies."

90. Defendants claim the Tax Plan helps customers drastically reduce their taxes.

91. Defendants claim that the Tax Plan helps customers "create income tax deductions."

92. Defendants claim that the Tax Plan helps "make typically non-deductible items deductible while receiving tax free reimbursements."

93. Defendants created videos regarding the Tax Plan and use those videos to promote the Tax Plan to customers.

94. Defendants speak with customers to try to convince them to purchase the Tax Plan.

95. Defendants speak at conferences, professional associations, and seminars to promote the Tax Plan.

96. CPS has held many presentations to promote and market the Tax Plan, including:

a. "Tax Savings In The Sand" conference in Destin, Florida in July 2016;

b. "Tax Savings In The Sand" conference in Destin, Florida in July 2017;

c. Webinars in December 2017 regarding tax planning.

d. Dinners in January 2018 to discuss reducing taxes for optometrists;

e. Webinars in February 2018 regarding recent tax law changes;

f. Webinars in August 2018 regarding how optometrists can lower their tax bills;

g. "Tax Reduction Webinar" in August and September 2018;

h. Convention in November 2018;

i. Webinars in March, April, and May 2019 seeking to help customers "keep more of [their] earnings by permanently reducing the amounts of Federal and State Income taxes [they] pay in 2019 and beyond;"

j. "Tax Savings In The Sand" conference in Destin, Florida in July 2019;

k. Calls in June 2019 regarding conservation easements;

l. Refresher courses regarding the Tax Plans in March 2020;

m. "Tax Savings In The Mountains" conference in Ridgedale, Missouri in July 2020; Tax Credit Update Webinars in February 2021.

97. CPS promotes the Tax Plans through professional associations, enters into sponsorship and partnership agreements with those associations, and agrees to pay money to those associations in return for customer referrals.

98. To encourage referrals, CPS implemented a "Client Vacation Giveaway" in 2020, promising to send three "winners" on a vacation if they referred business to CPS.

99. To obtain customers, CPS formed relationships with financial advisors across the country, including in Florida, Illinois, and Texas. CPS pays those advisors between 5% and 20% of the fee it receives for selling the Tax Plan to customers.

### D. Defendants Made and Furnished False Statements About Tax Benefits and Gross Valuation Overstatements

100. Defendants have made and furnished (or caused others to make and furnish) a plethora of materially false statements regarding the tax deductions available to Defendants' customers, as well as gross valuation overstatements regarding the rental value of dwellings and the value of marketing services.

101. Defendants primarily made and furnished those false statements, and gross valuation overstatements, through the written Tax Plan documents they created. They also made statements directly to their customers regarding the Tax Plans, as well as to their customers' tax return preparers.

102. Defendants falsely made and furnished statements that their customers' existing businesses could claim tax deductions for paying a large "marketing fee" to their newly-created marketing companies. But those deductions were unlawful

because the marketing company was not intended to be used for actual marketing activity, lacked a profit motive, and was a sham entity, and because the marketing fee was not an ordinary or necessary business expense within the meaning of 26 U.S.C. § 162.

103. Defendants falsely stated that their customers' newly-created marketing companies could claim tax deductions for providing benefits to their family members as "employees" (including minor children). These deductions included amounts for medical expense reimbursements, tuition assistance plans, and meals. But those deductions were unlawful because the marketing company lacked a profit motive and was a sham entity, the benefits were not ordinary or necessary within the meaning of 26 U.S.C. § 162, the customers' family members were not bona fide employees, and because the benefit plans violated rules prohibiting discrimination in favor of highly-compensated employees (such as 26 U.S.C. §§ 105(h), 127(b), 132(e)(2)).

104. Defendants falsely stated that their customers' newly-created marketing companies could claim tax deductions for providing compensation to their family members as "employees" (including minor children), such as salaries for children and retirement contributions. But those deductions were unlawful because they

were unreasonably high and because they were not ordinary or necessary expenses within the meaning of 26 U.S.C. § 162.

105. In some Tax Plans, Defendants notified customers of Internal Revenue Code provisions disallowing deductions for companies that provide benefits in a way that discriminates in favor of highly-compensated employees, with the definition of highly compensated employee having reference to all employees within a "controlled group" of companies as defined by 26 U.S.C. § 1563. Those provisions affect whether customers may provide benefits only to employees of the newly-created marketing companies (i.e., to the customer and his or her family members) or must also provide benefits to employees of the customers' existing companies. Defendants falsely stated that Section 1563 "provides mechanical ownership tests" to determine whether companies are part of a controlled group, when the regulations implementing that section (including 26 C.F.R. § 1.1563-1(a)(6)) require consideration to be given to "all the facts and circumstances" and provide that formal voting rights may be disregarded where the nominal owner of a company has expressly or impliedly agreed to vote in a certain way.

106. Defendants made material omissions by recommending that customers claim tax deductions for providing employee benefits to family members while failing to

inform them that employment arrangements with family members are subject to close scrutiny.

107. Defendants falsely stated that, by "engaging a tax attorney with the proper credentials" the taxpayer has met the standards [under 26 U.S.C. § 6664(c)] for reasonable cause" and thus can avoid IRS penalties. Engaging a tax attorney is not dispositive of meeting the standard for reasonable cause under 26 U.S.C. § 6664.

108. Defendants falsely stated that the fees the customers' existing business paid to the newly-created marketing companies would survive scrutiny under economic substance theories as long as they have "a legitimate business purpose." But having a legitimate business purpose alone does not necessarily imbue a transaction with economic substance.

109. Defendants made and furnished false statements, as well as gross valuation overstatements, regarding the rental value of customers' personal dwellings. For example, Defendants told one customer to claim a $119,000 tax deduction in one year for renting four dwellings to his business for fourteen days each. Defendants told another customer to claim a $105,000 tax deduction in one year for renting two dwellings to his business for fourteen days each.

110. Defendants made and furnished false statements, as well as gross valuation overstatements, regarding the value of marketing services their customers' newly-created marketing companies provided.

### E. Defendants Knew or Had Reason to Know Their Statements Were False

111. Defendants are in the business of promoting tax strategies to their customers for compensation, and have been in that business for many years.

112. Defendants promoted the Tax Plan as a tax strategy.

113. Dallas is a licensed attorney with more than 35 years of experience, including 18 years of experience running his own law firm focused on income tax and estate planning.

114. Dallas has advanced professional degrees, having earned a J.D. and an LL.M. in taxation.

115. Mardis has a Bachelor's degree in marketing, has studied accounting, and has been in the financial service industry since 1993. He has experience working on estate planning and insurance and has been partners with Dallas since approximately 2009.

116. Mardis claims to be a successful business owner with practical knowledge and expertise and has focused his practice into reducing income taxes for successful business owners.

117. Defendants hold themselves out as professionals, and charge customers thousands of dollars (and more) for providing information about possible tax benefits.

118. Defendants hold themselves out as having thoroughly researched the tax laws identified in the Tax Plan.

119. Defendants hold themselves out as authorities on the tax topics set forth in the Tax Plan.

120. Defendants regularly meet with customers to monitor their implementation of the Tax Plan and "to keep them on track."

121. Given Defendants' professional qualifications and years of experience, they knew or had reason to know that their customers were not entitled to the tax benefits they stated were available.

122. Some of Defendants' potential customers stated that the Tax Plan "sounds too good to be true."

123. Independent professionals told Defendants about concerns they had regarding the Tax Plan.

124. Mardis stated that he and CPS do not let their customers' CPAs review the Tax Plan prior to implementation.

125. Defendants have admitted the marketing company helps customers claim tax deductions for providing benefits to themselves and their family members.

126. Defendants have attempted to structure the Tax Plan to avoid IRS scrutiny.

127. For example, they contend that the Tax Plan makes it appear that their customers earn less money, which they claim reduces audit risk.

128. Mardis and Dallas have characterized the Tax Plan as pushing aggressive tax strategies. Defendants know that the IRS has audited many of their customers and has repeatedly disallowed many of the deductions those customers claimed on their tax returns.

129. Mardis and Dallas have admitted that at least some of their customers use the Tax Plan to claim inappropriate and unreasonably high tax deductions.

### F. The Tax Plan Conspiracy And Plaintiffs

130. CPS initially solicited Plaintiffs using the Tax Plan provided above.

131. CPS had been recommended to Plaintiffs by Cogent Analytics, a business consulting firm Plaintiffs had hired to consult for BMSM.

132. Cogent Analytics recommended CPS to Plaintiffs as a reliable tax consulting firm, neglecting to perform due diligence before making this recommendation, thereby misleading Plaintiffs.

133. Plaintiffs and CPS executed an Engagement Agreement on February 15, 2023.

134. The Engagement Agreement provided that Plaintiffs would pay to CPS an “Investment” of $48,000.

135. Pursuant to the Engagement Agreement, CPS agreed to provide the following services:

a. marketing blueprint containing:
    i. an analysis of the current marketing;
    ii. a new marketing plan; and
    iii. marketing budget;
b. an analysis of restructuring for the primary business of the Client;

c. an organizational flow chart of the applicable entities of the Client;

d. operational instructions (the "Operational Instructions") detailing elements of the planning for the Client;

e. access to instructional videos on many of the strategies;

f. free participation in the Document Assistance Program C'DAP') for the next 12 month period after becoming a Client; subsequent participation shall require a separate fee;

g. an independent appraisal of rental rate for I dwelling unit;

h. a turn-key set up of up to 2 entities;

i. Reasonable Compensation Study for an Employee's salary from an S Corporation;

j. State and Federal Income Tax Returns of the Business Development Company will be outsourced to an affiliated company and a separate fee applies;

k. Estate Planning Review;

l. Business Succession Planning Review; and

m. Asset Protection Review.

136. The Engagement Agreement went on to state that, while CPS was not a law firm, Plaintiffs would be represented "by law firm specified by CPS," leading Plaintiffs to believe that sufficient legal advice and services would be provided by actual, licensed attorneys.

137. The Engagement Agreement provided that Summit would provide accounting services to Plaintiffs.

138. The Engagement Agreement also mandated confidentiality, and the confidentiality provision did not include any carve-out for seeking independent legal, accounting, or tax advice.

139. The implication of the Engagement Agreement was that CPS would, either directly or indirectly, provide actionable legal, accounting, and tax advice through the Engagement Agreement, so Plaintiffs would not only not be permitted, but would not need to consult outside counsel to independently verify the advice Defendants provided.

140. Following execution of the Engagement Agreement, Plaintiffs would learn that legal and tax advice would be provided by DAJ Tax Law, Dallas, and Thomas.

141. To secure the Engagement Agreement, Plaintiffs paid to Defendants $9,600 on February 15, 2023.

142. This dual-representation created an unwaivable conflict of interest between DAJ Tax Law, Dallas, CPS, and Plaintiffs, as DAJ Tax Law did not properly disclose the potential conflict to Plaintiffs.

143. Plaintiffs retained the services of CPS, Summit, DAJ Tax Law and Cogent Analytics with the expectation of receiving lawful tax advice. However, the

Defendants engaged in a coordinated scheme involving the setup of sham marketing companies and bogus deductions, resulting in Plaintiffs' exposure to IRS penalties and financial damages.

144. Defendant CPS induced Plaintiffs into a fraudulent tax strategy, promoting unlawful deductions and providing fraudulent information regarding tax savings. CPS provided a 'Tax Plan' document outlining purported deductions that were later disallowed by the IRS.

145. In accordance with Defendants' fraudulent Tax Plan, Plaintiffs created Redfish Promotions, Inc. ("Redfish") and put Merlin VanGerpen and Monica Lester, members of Cogent Analytics, as beneficial owners of the marketing entity, providing them all rights and responsibilities appurtenant to such an appointment.

146. Neither VanGerpen nor Lester provided any substantive consideration for their ownership in Redfish.

147. In documents provided by DAJ Tax Law, the Defendants made clear that VanGerpen and Lester (identified as Shareholder 2 and 3) would be entitled to distributions greatly exceeding what Plaintiffs would be entitled to if they had not participated in the Tax Plan.




148. In effect, Defendants provided advice that set up VanGerpen and Lester as aggregate 96% shareholders of Plaintiff's "marketing company," which would entitle them to distributions of income that would otherwise be directed to Plaintiffs.

149. Plaintiffs also relied on a report prepared by the Defendants that asserted that they could write-off as much as $5,400 per day on their taxable income for the use of their private residence for "business meetings."

150. While carrying the veneer of legitimacy, this report was grossly inflated from fair market values and encouraged the "rental" of Jeff and Lindley's primary residence for events that were only speculatively business-related.

151. Summit directly contributed to the scheme by providing advice on structuring Plaintiffs' finances to support the Tax Plan, failing to ensure the legitimacy of their recommendations.

152. DAJ Tax Law, Dallas, and Thomas drafted the necessary legal documents for CPS's tax scheme and furnished Plaintiffs with incorrect tax advice, while also invoicing Plaintiffs for the services rendered under this scheme.

153. On October 26, 2023, Thomas and DAJ Tax Law sent to Plaintiffs various legal documents pursuant to the Tax Plan that purported to legitimize one-day rentals of Jeff and Lindley's private residence for various "business meetings."




154. In reliance on Defendants' advice, Plaintiffs utilized the Tax Plan and implemented the supposed write-off scheme recommended by Defendants and claimed those deductions on their business and personal taxes.

155. After CPS was enjoined from continuing to sell, market, or implement the Tax Plan, Cogent Analytics attempted to perpetuate the fraudulent scheme by invoicing Plaintiffs to continue to provide the exact same advice.

156. The Tax Plan described more fully in Section III, Subsections A through E above was the exact Tax Plan marketed to Plaintiffs, purchased by Plaintiffs, and relied upon by Plaintiffs.

157. Plaintiffs used the advice provided by the Defendants to implement the Tax Plan, claiming thousands of dollars in tax deductions that Plaintiffs now understand to be illegal.

158. Defendants knew or should have known that the Tax Plan provided illegal and inappropriate legal, accounting, and tax advice, but they provided the Tax Plan to Plaintiffs anyway.

159. By using various professionals, such as licensed attorneys and CPAs, the Defendants participated in a coordinated conspiracy with the intent to defraud Plaintiffs out of their money.

## G. CPS, Mardis, And Dallas Enter Consent Decree

160. On July 26, 2024, the United States of America initiated an action against CPS, Mardis, and Dallas on these allegations in the United States District Court for the Southern District of Mississippi, Case No. 3:24-cv-439-DPJ-ASH.

161. Four days later, on July 30, 2024, CPS, Mardis, and Dallas consented to the entry of a Final Judgment of Permanent Injunction without further notice. (Docs. 7-9 of that action).

162. The following day, a Final Judgment of Permanent Injunction was entered against CPS, Mardis, and Dallas. (Docs. 11-13 of that action).

163. On October 10, 2024, CPS provided a written affidavit that it had substantially complied with the terms of the Final Judgment. (Doc. 14 of that action).

164. Despite this, on September 18, 2024, Cogent Analytics sent an invoice to Plaintiffs requesting payment of $38,400.00 to continue the work that CPS had already been enjoined from continuing.

165. The amount Cogent Analytics requested was substantially the same amount Plaintiffs would have paid to CPS to continue the scope of work CPS had agreed to do but was now enjoined from continuing by the United States District Court for the Southern District of Mississippi.

166. Cogent Analytics went on to explain that the $38,400.00 was

> "… the remaining due for the strategic tax planning. We are transitioning all clients from CPS and if you would like to be part of that transition in the future, please let me know. As always, Cogent backs what they partnered with our clients. The fee to continue on with yearly tax meetings, be able to participate in the fee simple easement program the cost is 22% of the original fee. This will not be billed until you decide to do this or one year from the implementation date, whichever comes first. My suggestion with all of the changes coming in the 2026 tax laws, it is important to keep this in force year over year. Please let me know if you have any questions. Thank you for continuing with all of the calendar invites for the meetings. Documentation is so critical."

167. That same day, Cogent Analytics implicated DAJ Tax Law, stating that,

> "The fee simple easement program isn't thru CPS – it is thru DAJ Law. We see nothing from it anyway. It is a pass thru to our clients. As for the letter you sent, I could comment but won't as it has become a legal matter and I have passed it on to our corporate attorney and Rob our owner. The injunction letter was required as their settlement with the IRS. This all stems back to the President who beat his wife. The plan is valid as long as it is documented which you have done an excellent job of."

168. Despite the injunction against CPS, Mardis, and Dallas, Cogent Analytics continued to misrepresent the validity of the Tax Plan.

169. Cogent Analytics intended to perpetuate the same fraudulent Tax Plan that CPS had concocted.

170. At that time, Plaintiffs demanded that Defendants immediately cease any work for them and issue a full refund of any fees paid to Defendants.

171. Defendants have not issued a refund.

172. On August 20, 2025, Plaintiff, through counsel, sent litigation hold notices to each of the Defendants with an earlier draft of this Complaint.

173. No Defendant responded to those letters.

## IV. Causes of Action

### A. COUNT I – Fraud in The Inducement
***(Against Capital Preservation Services, LLC; Dallas Anthony & Jeffords, PLLC; Thomas Walton Dallas; Jason Todd Mardis)***

174. Plaintiffs reincorporate the allegations set forth in Sections I–III above.

175. Defendants CPS, DAJ Tax Law, Dallas, and Mardis made numerous material misrepresentations and misleading statements of existing fact and law to Plaintiffs concerning the legality, viability, structure, and tax consequences of the so-called "Tax Plan."

176. These misrepresentations were central to Plaintiffs' decision to engage Defendants and were not peripheral or incidental statements, but instead went to the core nature of the services Defendants purported to provide.

177. Those misrepresentations included, without limitation, express and implied representations that:

a. the Tax Plan was lawful, compliant with the Internal Revenue Code, and supported by existing statutory and regulatory authority;

b. Plaintiffs could properly and defensibly deduct substantial "marketing fees," residential rental expenses, and employee benefits paid to family members;

c. the overall structure of the Tax Plan had economic substance, a legitimate business purpose, and would withstand IRS scrutiny;

d. reliance on Defendants' legal, accounting, and tax professionals would protect Plaintiffs from penalties, interest, and adverse audit outcomes; and

e. Defendants had thoroughly researched, vetted, tested, and validated the Tax Plan before recommending it to Plaintiffs.

178. At the time these representations were made, Defendants knew they were false or misleading, or made them recklessly without regard to their truth, given existing tax law, applicable regulations, IRS enforcement activity, and prior audits and disallowances of substantially identical strategies.

179. Defendants intended that Plaintiffs rely upon these misrepresentations to induce Plaintiffs to enter into the Engagement Agreement, pay substantial upfront and ongoing fees, and implement the Tax Plan as designed.

180. Plaintiffs reasonably and justifiably relied on Defendants' representations in executing the Engagement Agreement, forming Redfish Promotions, Inc., restructuring their affairs, and claiming deductions recommended by Defendants.

181. As a direct and proximate result of Defendants' fraudulent conduct, Plaintiffs suffered damages including, but not limited to, fees paid to Defendants, exposure to additional tax liabilities, penalties, interest, remediation costs, professional fees, and other consequential damages.

182. Defendants' conduct was willful, intentional, and undertaken with conscious disregard for Plaintiffs' rights, entitling Plaintiffs to an award of punitive damages under applicable law.

### B. COUNT II – Breach of Contract
### *(Against Capital Preservation Services, LLC)*

183. Plaintiffs reincorporate the allegations set forth in Sections I–III above.

184. Plaintiffs and CPS entered into a valid and enforceable Engagement Agreement pursuant to which Plaintiffs agreed to pay substantial fees in exchange for specified services.

185. Plaintiffs fully performed, or substantially performed, all material obligations required of them under the Engagement Agreement, including payment of fees.

186. CPS breached the Engagement Agreement by, among other things:

a. failing to provide lawful and competent tax planning services;

b. providing services that were enjoined by federal court order or otherwise unlawful;

c. failing to provide the benefit of the bargain promised to Plaintiffs; and

d. misusing the Engagement Agreement to funnel Plaintiffs into an illegal tax scheme.

187. CPS's breaches were material and deprived Plaintiffs of the core purpose of the Engagement Agreement.

188. As a direct and proximate result of CPS's breaches, Plaintiffs suffered damages including fees paid, consequential damages, and costs incurred to remediate CPS's misconduct.

### C. Count Iii – Negligent Misrepresentation
***(Against All Defendants)***

189. Plaintiffs reincorporate the allegations set forth in Sections I–III above.

190. In the course of their business and for their own pecuniary benefit, Defendants supplied information to Plaintiffs concerning tax planning, deductions, compliance, and risk exposure.

191. That information was false, incomplete, or misleading, and Defendants failed to exercise reasonable care, diligence, or competence in obtaining, evaluating, or communicating it.

192. Defendants knew or should have known that Plaintiffs would rely on this information in making significant financial and tax-related decisions.

193. Plaintiffs justifiably relied upon Defendants' negligent misrepresentations in implementing the Tax Plan.

194. Plaintiffs suffered damages as a direct and proximate result of that reliance.

### D. Count Iv – Professional Negligence / Accounting Malpractice *(Against Summit Accounting Services, Llc)*

195. Plaintiffs reincorporate the allegations set forth in Sections I–III above.

196. Summit owed Plaintiffs a professional duty to exercise the level of skill, care, and diligence ordinarily exercised by reasonably prudent accountants under similar circumstances.

197. Summit breached that duty by, among other things:

a. endorsing, facilitating, or failing to object to an unlawful tax strategy;

b. failing to adequately advise Plaintiffs of material legal and tax risks associated with the Tax Plan;

c. failing to ensure that deductions and positions taken complied with applicable tax law; and

d. failing to recommend independent review or alternative lawful approaches.

198. Summit's breaches of its professional duties were a proximate cause of Plaintiffs' damages.

### E. Count V – Legal Malpractice

***(Against Dallas Anthony & Jeffords, Pllc; Thomas Walton Dallas; Hunter Thomas)***

199. Plaintiffs reincorporate the allegations set forth in Sections I–III above.

200. An attorney-client relationship existed between Plaintiffs and these Defendants, giving rise to duties of competence, loyalty, disclosure, and independent professional judgment.

201. Defendants owed Plaintiffs a duty to provide accurate, competent, and conflict-free legal advice consistent with applicable standards of care.

202. Defendants breached that duty by:

a. drafting, approving, and endorsing legally defective or misleading documents;

b. providing incorrect and incomplete tax advice;

c. failing to disclose or properly manage conflicts of interest;

d. failing to advise Plaintiffs of known IRS enforcement risks and adverse authority; and

e. participating in and advancing a scheme primarily designed to generate fees rather than lawful outcomes.

203. Plaintiffs suffered damages as a direct and proximate result of these breaches.

### F. COUNT VI – Negligence / Failure To Perform Due Diligence *(Against Cogent Analytics, Inc.; Merlin Vangerpen; Monica Lester)*

204. Plaintiffs reincorporate the allegations set forth in Sections I–III above.

205. Cogent and its agents undertook to advise Plaintiffs regarding business, financial, and strategic matters, including recommendations of third-party professionals.

206. In doing so, Defendants owed Plaintiffs a duty to exercise reasonable care, including conducting reasonable due diligence before recommending CPS and related entities.

207. Defendants breached that duty by recommending CPS without adequate vetting and by continuing to promote or endorse the Tax Plan after regulatory enforcement actions became known.

208. Plaintiffs relied on Cogent's recommendations to their detriment.

209. Plaintiffs suffered damages as a proximate result of this negligence.

### G. Count Vii – Civil Conspiracy
***(Against All Defendants)***

210. Plaintiffs reincorporate the allegations set forth in Sections I–III above.

211. Defendants combined, agreed, and conspired to accomplish an unlawful purpose, or a lawful purpose by unlawful means, namely the promotion, sale, and implementation of a fraudulent tax scheme.

212. Each Defendant committed overt acts in furtherance of the conspiracy.

213. Plaintiffs suffered damages as a direct and proximate result of Defendants' concerted actions.

### H. COUNT VIII – Unjust Enrichment / Money Had And Received
***(Against All Defendants)***

214. Plaintiffs reincorporate the allegations set forth in Sections I–III above.

215. Defendants knowingly accepted and retained substantial fees and other benefits from Plaintiffs.

216. Defendants' retention of those fees is unjust and inequitable given the unlawful and improper nature of the services provided.

217. Plaintiffs are entitled to restitution, disgorgement, and all equitable relief necessary to prevent Defendants from being unjustly enriched.

## V. Prayer for Relief

WHEREFORE, Plaintiffs respectfully request that judgment be entered in their favor and against Defendants, and that the Court award the following relief:

1. A declaration that Defendants engaged in fraudulent, negligent, and unlawful conduct as alleged herein;

2. Rescission of the Engagement Agreement and any related agreements entered into between Plaintiffs and Capital Preservation Services, LLC, together with restitution of all fees and amounts paid by Plaintiffs to CPS and any co-defendants who received fees or benefits arising from the Tax Plan;

3. Compensatory damages in an amount to be determined at trial, including but not limited to:

    1. all fees paid to Defendants;

    2. increased tax liabilities, penalties, and interest incurred or reasonably expected to be incurred;

    3. costs associated with remediation, amended returns, audit defense, and professional services; and

4. all other consequential and incidental damages proximately caused by Defendants' conduct;

4. An award of punitive damages against the appropriate Defendants to punish and deter willful, wanton, fraudulent, and malicious conduct;

5. A declaration that any purported ownership interests, stock issuances, or equity grants in Redfish Promotions, Inc. to Monica Lester and Merlin VanGerpen are void and unenforceable due to lack of consideration, fraud in the inducement, and illegality, and an order rescinding and canceling those interests;

6. An order requiring Monica Lester and Merlin VanGerpen to relinquish, surrender, and disclaim any ownership interests, rights, distributions, or control associated with Redfish Promotions, Inc., and directing Redfish Promotions, Inc. to amend its corporate records accordingly;

7. Disgorgement of all ill-gotten gains received by Defendants as a result of the conduct alleged herein;

8. Pre-judgment and post-judgment interest as allowed by law;

9. An award of Plaintiffs' reasonable attorneys' fees and costs where permitted by law;

10. A permanent injunction prohibiting Defendants from marketing, promoting, selling, or participating in any tax avoidance or tax reduction scheme substantially similar to the Tax Plan;

11. Such other and further legal or equitable relief as the Court deems just and proper.

**PLAINTIFF REQUESTS TRIAL BY JURY.**

Respectfully submitted,
***/s/ Tripp Watson***
Joseph E. "Tripp" Watson, III
Attorney for Plaintiffs

*Of Counsel*
Intellectual Property Consulting
2007 3rd Avenue North
Birmingham, Alabama 35203
205.545.7278
twatson@iplawconsulting.com

# REQUEST FOR SERVICE

Plaintiff requests that the Defendants be served via commercial carrier pursuant to Ala. R. Civ. P. 4(a)(i)(3) (made applicable by Fed. R. Civ. P. 4(e)(1) at the following addresses:

Capital Preservation Services, LLC
c/o Registered Agents Inc
30 N Gould St Ste R
Sheridan, WY 82801

Summit Accounting Services, LLC
c/o Dustin Jeffords, Registered Agent
402 Elderberry Court
Ridgeland, MS 39157

Cogent Analytics, Inc.
c/o Robert D. Braiman, Registered Agent
7027 Albert Pick Road
Suite 300
Greensboro, NC 27409-9522

Merlin VanGerpen
7027 Albert Pick Road, Ste. 300
Greensboro, NC 27409

Monica Lester
7027 Albert Pick Road, Ste. 300
Greensboro, NC 27409

Jason Todd Mardis
601 Crescent Blvd.
Suite 102
Ridgeland, MS 39157

Dallas Anthony & Jeffords, PLLC
c/o Dustin Jeffords
601 Crescent Blvd, Suite 102
Ridgeland, MS 39157

Thomas Walton Dallas
601 Crescent Blvd.
Suite 102
Ridgeland, MS 39157

Hunter Thomas
601 Crescent Blvd.
Suite 102
Ridgeland, MS 39157